Filed 2/9/21  Pruett v. Dental Board of California CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| RICHARD LLOYD PRUETT, | C088436 |
| Plaintiff and Appellant, | (Super. Ct. No. 17CV02405) |
| v. | |
| DENTAL BOARD OF CALIFORNIA, | |
| Defendant and Respondent. | |

Richard Lloyd Pruett (Pruett) appeals from a judgment denying his petition for writ of administrative mandate, in which he sought to set aside the decision of the Dental Board of California (Board) revoking his dental license.  On appeal, Pruett argues: (1) the trial court erred in proceeding with the hearing on the petition over his objection that the Board failed to provide him with a service copy of the lodged administrative record; and (2) insufficient evidence supports the trial court's finding that he committed acts of sexual abuse or misconduct against two female patients.  Finding no error, we affirm.

**I.  BACKGROUND**

1

Pruett obtained his dental license in 1973. He established a practice in Chico, emphasizing holistic dentistry. As part of his practice, Pruett offered cranial release and myofascial release therapies as treatments for temporomandibular joint disorder (TMJ).[1]

A.  *Administrative Proceedings*

The Board filed an accusation against Pruett on August 8, 2016. The accusation alleges that Pruett committed acts of sexual abuse or misconduct against two female patients, M.K. and C.K. (Bus. & Prof. Code, §§ 726 [sexual misconduct with a patient constitutes unprofessional conduct and grounds for discipline] and 1680, subd. (d) [unprofessional conduct includes acts of sexual abuse, misconduct, or relations with a patient that are substantially related to the practice of dentistry].) The accusation further alleges that Pruett had been disciplined in 1994 for committing sexual acts on another patient he was treating for TMJ, in violation of Business and Professions Code section 1680, subdivision (e). Pruett filed a notice of defense. An administrative hearing was held before an administrative law judge (ALJ) over the course of four days in April and May 2017.

1.  *The Board's Evidence*

During the administrative hearing, M.K. testified that she was introduced to Pruett through mutual friends and became Pruett's patient in 2009. M.K. was struggling financially at the time. She had no dental insurance and paid for her dental care out of pocket.

M.K. developed significant dental problems in early 2012. Pruett was aware of M.K.'s financial situation and offered to provide continuing dental care in exchange for her cleaning his dental office three times a week. M.K. agreed to the trade.

---

[1] Cranial release therapy involves the manipulation of the cranial bones and neck muscles. Myofascial release therapy involves the application of gentle sustained pressure on the connective tissue.

M.K. and Pruett were alone in the office one evening between January and March 2012. M.K. complained of neck and back pain. Pruett offered to give her a massage and directed her to an upstairs room with an adjustable massage table. Pruett massaged M.K.'s neck for a moment and then moved his hands to her breasts and nipples. During the administrative hearing, M.K. recalled that Pruett asked, "Why aren't your nipples getting hard?" M.K. had no idea how to respond, so she said nothing. The massage came to an end, and M.K. left the office a short time later.

M.K. continued cleaning Pruett's dental office and receiving dental care from him. She found herself alone with Pruett on another occasion in May 2012. M.K. was suffering from a toothache. Pruett briefly examined her tooth in a patient treatment room or operatory. He then complained he had pulled a groin muscle and asked for a massage. M.K., a massage therapist, agreed. Pruett went into an adjacent operatory. M.K. entered the operatory a short time later and found that Pruett had removed his jeans and was sitting in a dental chair in his underwear.

M.K. began massaging Pruett's knee. Pruett instructed her to go higher, adding "Oh, Junior is getting excited." M.K. noticed that Pruett was getting an erection. She stopped the massage and washed her hands. She then leaned against the dental chair to stretch her back. Pruett put his jeans back on and came up behind M.K., and pressed himself against her backside. M.K. could feel Pruett's erection. M.K. left the office in a state of shock. She did not tell anyone about what happened.

A short time later, M.K. developed a serious dental infection. Pruett prescribed antibiotics and referred her to the emergency room. Pruett later extracted M.K.'s infected tooth.

Following the extraction, M.K. decided she no longer wished to continue as Pruett's patient. She saw another dentist, who recommended a comprehensive treatment plan. M.K. believed that Pruett should be responsible for paying for the treatment plan, for which she had received an estimate exceeding $40,000. She forwarded a copy of the

3

estimate to Pruett, with a letter asking him to "take care of this as soon as possible." When Pruett failed to respond, M.K. sent another letter, threatening legal action and stating, "I don't want to bring JUNIOR or the way you treated me with disrespect with the MASSAGES behind closed doors etc. [into this] but you are not leaving me other choices."

Pruett responded sometime later with a four-page letter, written in collaboration with his office manager, Cindy. As relevant here, the letter addresses M.K.'s allegations indirectly, describing the massages as a mutual exchange of therapeutic services, and adding, "So we were looking out for one another and helping each other as friends and co-workers do on several occasions. Now you are bringing up issues that were never anything but therapeutic." The letter also offered to provide additional treatment, "at no charge, as long as we have a written agreement that says that you will be satisfied with this treatment." M.K. declined the offer, stating she would not be returning to Pruett's office, as she had "lost all trust and confidence in [his] practice."

M.K. said nothing about what had happened with Pruett for more than a year. Finally, she confided in a life coach, who referred her to a rape crisis center. An outreach counselor from the rape crisis center accompanied her to the police department where M.K. made a report. According to the report, which was admitted into evidence at the hearing, M.K. initially declined to press charges, but later changed her mind. A supplemental police report prepared some nine months later indicates that an officer told M.K. that he "did not know if the acts described in the original report would rise to the level of criminal acts," but he would "forward the case to the District Attorney's Office for review." No further action appears to have been taken by law enforcement.

M.K. complained to the Board in December 2014 or January 2015. Her complaint included both allegations of sexual misconduct and allegations of dental malpractice. The Board investigated the allegations regarding Pruett's dental care and concluded that he did not violate the standard of care. The Board did not address M.K.'s allegations of

4

sexual misconduct until later, when the Board received a complaint from another patient, C.K.

C.K. became Pruett's patient in September 2014. Although she had received training as a massage therapist, she was unemployed at the time and struggling financially. She had no dental insurance.

C.K.'s first appointment with Pruett was uneventful. Pruett examined C.K.'s teeth, took x-rays, and established a treatment plan for her. That plan included a course of myofascial release therapy for TMJ.

C.K. returned to Pruett's office for a two-part appointment on October 6, 2014. The appointment was originally scheduled for early afternoon but was moved to the end of the day at the request of someone from Pruett's office. The first part of the appointment involved an occlusal adjustment, for which an assistant was present. However, the assistant left for the day after the procedure was completed, leaving C.K. alone with Pruett.

Pruett then conducted myofascial release therapy. He began with small and deliberate movements to C.K.'s head, mouth, and jaw, including sustained pressure on a muscle inside her mouth, which brought her immediate relief from pain. He then massaged C.K.'s neck, shoulders, and pectoral region using faster, jostling movements. He made small talk with C.K. as he performed these actions, asking her casual questions about her personal and professional life. After some time, Pruett started slipping his hands under C.K.'s bra to quickly touch her breasts and nipples. During the hearing, C.K. estimated that Pruett touched her breasts and nipples between 10 and 20 times. All the while, Pruett continued to make casual conversation "like it was the most normal thing in the world." C.K., shocked, responded to Pruett's questions and said nothing to stop what she knew to be a violation of professional norms.

Pruett asked C.K. whether she would like to trade massage services. When C.K. said she did not have a massage table, Pruett responded that he could provide a table, if she could get a room.

At one point during the massage, Pruett pressed on a swollen lymph node under C.K.'s right arm, causing her to exclaim, "Ouch, that hurts!" Pruett offered to drain the lymph node, and C.K. declined.

After approximately one hour, Pruett touched C.K.'s abdomen and thigh, and then rolled his stool over to a desk area. He verified C.K.'s phone number, leading C.K. to believe he planned to call her to meet up. He offered to give C.K. a "full body lymph massage" and offered to massage her psoas muscle.[2] Finally, the appointment came to an end, and C.K. left the now empty dental office. She returned to Pruett's office the next day for a cleaning. She kept the appointment knowing she would not see Pruett.

C.K. grew increasingly upset over her interaction with Pruett over the next several weeks. She spoke with friends and family but took no immediate action. Then, on December 4, 2014, she received a telephone call from Cindy, Pruett's office manager. Cindy was merely calling to confirm C.K.'s appointment for the following day, but C.K., incensed, told Cindy that Pruett had sexually assaulted her during her last appointment, and she would never return. Cindy told C.K. she would call her back.

C.K. received a letter from Cindy several days letter. The letter praised Pruett as a person and professional and asserted that C.K.'s allegations could not be true, as Cindy and another employee had been working late on the evening in question. But the date of the incident was itself the subject of dispute. Cindy's letter referred to an appointment on

---

[2] The psoas is "a large muscle of the loin which arises from the lumbar vertebrae and is inserted with the iliacus muscle into the lesser trochanter of the femur, together acting to flex the hip." (Oxford English Dict. (Online ed. 2021) <https://www.oed.com/view/Entry/153829?redirectedFrom=psoas#eid>[as of Feb. 3, 2021], archived at<https://perma.cc/XT8X-LDUX> defining "psoas.")

October 13, 2014, and an entry for such an appointment appeared in C.K.'s patient chart. However, C.K. maintained she did not have an appointment on October 13, 2014, and had not received an appointment reminder for that date, as she had for other appointments. Although she acknowledged returning to Pruett's office for a cleaning on October 7, 2014, she was adamant that she never again returned after that date.

Cindy's letter only served to anger C.K. further. A friend encouraged her to file a police report. She filed a police report in December 2014, but no action was taken. She filed a complaint with the Board in January 2015. C.K.'s allegations in the police report and complaint are generally consistent with her testimony at the hearing.

Board investigator Kelly Silva testified that she investigated M.K. and C.K.'s complaints and determined that Pruett had engaged in sexual misconduct. As part of her investigation, Silva examined Pruett's prior disciplinary records and learned that he had been placed on probation in 1994 for sexual misconduct with another patient. That matter, too, involved an ostensibly therapeutic massage that became sexual. Pruett described the incident in a handwritten letter to the Board submitted in connection with a petition to terminate his probation. According to Pruett, the patient " 'slipped out my junior and began giving me oral sex like a pro.' " The Board denied the petition and Pruett successfully completed five years of probation.

Silva reported her findings to the Butte County District Attorney's Office. She was told by someone from the District Attorneys' Office that no action was going to be taken in the case involving M.K. because the statute of limitations had run.

B.     *Pruett's Evidence*

Pruett, who believes himself to be the only holistic dentist in the Chico area, testified that he was "born to help people," and goes "above and beyond" by putting patients on payment plans when they cannot afford to pay for their dental care. Pruett explained that he works in close collaboration with Cindy, who manages the business and

7

operational side of his solo practice, handling patients' complaints and preparing any written responses.

Pruett testified that M.K. was a friend, although not an especially close one. He recalled that M.K. frequently complained about pain in her back and neck and acknowledged offering to massage her in an upstairs room in his dental office. He explained that he directed M.K. to a sofa in the upstairs room (not a massage table), and applied pressure to her shoulders to help her stretch. He denied touching M.K.'s breasts or making any comment regarding her nipples.

Pruett also acknowledged receiving a massage from M.K. However, he claimed he had injured his knee, not his groin, and M.K. was the one who suggested the massage, not him. He explained that he removed his jeans to allow access to the injured knee, draping a towel over his boxer shorts. He admitted that he made "a bad joke" during the massage, elaborating that he said something like, "if she worked past the halfway point, that Junior might wake up." Pruett acknowledged the joke was "inappropriate." However, he denied that the joke was intended to convey any sexual interest or intent. He also denied having an erection or pressing up against M.K.

Pruett testified that M.K. was a "negative person" who was always complaining about back and neck pain, her dental issues, or "[l]ife in general." He noted that M.K. never said or did anything to indicate that she was offended by him, adding that "she's not one to be quiet." He said that he was shocked by her accusations, and theorized that she was lying in order to extort money from him for additional dental work.

Pruett also decried C.K. as a liar. He acknowledged performing a "cranial" on her, but claimed that Cindy and another employee were present in the office at the time. He testified that C.K. asked him to examine her swollen lymph node. He acknowledged that he might have reached under C.K.'s bra strap to palpate the swollen lymph node, but denied putting his hands under her bra cups or touching her breasts. He recalled that C.K. reacted when he touched her lymph node, and noted that she was not shy about

8

asking him to stop. He denied offering to give C.K. a full body lymph massage, or offering to trade massage services with her.

Pruett explained that he asked C.K. about the psoas muscle in order to test her knowledge as a massage therapist. C.K. seemed unfamiliar with the psoas muscle, Pruett said, so he touched her abdomen to indicate its general location. Pruett acknowledged touching C.K.'s thigh, but claimed he did so in the context of an anecdote about an acquaintance who received myofascial release therapy in connection with a leg injury.

Pruett was emphatic that C.K. returned to his office for another "cranial" on October 13, 2014, pointing to the existence of a receipt for the visit and notations in C.K.'s chart. He acknowledged, however, that no appointment reminder appeared for an October 13, 2014 appointment on the receipt for C.K.'s October 6, 2014 appointment, as would ordinarily be the case.

With respect to the prior disciplinary proceeding by the Board, Pruett acknowledged having been accused of approaching another TMJ patient's breasts with his hands. Pruett denied the accusation, but allowed that he acted irresponsibly in failing to stop the patient from unexpectedly initiating oral sex on him. That incident, he said, taught him to be more vigilant about maintaining appropriate boundaries with patients.

Cindy, a self-described "workaholic," testified that, as office manager, she was aware of almost everything affecting Pruett's dental practice. She maintained that, in her 14 years with Pruett, she had never seen or heard him behaving inappropriately with female patients. Although Cindy was aware of Pruett's prior disciplinary record, she believed he had been treated unfairly, as the encounter was consensual and the publicly available record meant that Pruett must continue to suffer the consequences for a bad choice he made many years ago.

Cindy testified that she was aware of M.K.'s allegations, having worked with Pruett to prepare a written response. She suggested that M.K. is preoccupied with her appearance, and thinks "every guy who walks down the street is looking at her breasts."

9

Based on her long association with Pruett, and familiarity with M.K., Cindy opined that Pruett would not have behaved inappropriately with M.K., and therefore, M.K. must be lying.

Turning to C.K., Cindy opined that she, too, must be lying. Cindy maintained that C.K. had an appointment with Pruett on October 6, 2014, at 1:00 p.m. She explained that Pruett could not have assaulted C.K. on the afternoon of October 6, 2014, because Cindy and others were present in the office at the time. She hypothesized that C.K. must have made an appointment for another "cranial" following her cleaning on October 7, 2014, adding that a patient who had been sexually assaulted on October 6 would have been unlikely to return to the scene of the assault on October 7 and October 13. Cindy acknowledged that C.K. had not received an appointment reminder for the October 13, 2014 appointment, but explained that the scheduling software sometimes fails to generate reminders.

Throughout her testimony, Cindy was emphatic that she had never heard of any other complaints of Pruett behaving inappropriately with female patients. On cross-examination, Cindy was confronted with a series of letters indicating that another former patient, K.N., had accused Pruett of touching her breasts in 2006. Although Cindy claimed not to remember the incident, the tone, style and syntax of the letters was consistent with Pruett's letter to M.K., suggesting that Cindy may have had a hand in writing those letters as well.

D.W. and S.W., the mutual friends who introduced M.K. to Pruett, testified that M.K. had a reputation as an unstable woman who struggled with truth-telling. D.W. additionally testified that M.K. had accused him of touching her inappropriately some years ago. Other female patients testified they had received myofascial and cranial release treatments from Pruett and found him to be professional and appropriate. One former employee testified that she had worked with Pruett for five years and had never known him to behave inappropriately towards M.K. or anyone else. However, another

10

former employee testified in rebuttal that Pruett regularly offered massages to Cindy and others, engaged in "tickle fights" with Cindy, and presided over an unprofessional "circus" atmosphere in the office.

### 3. The ALJ's Proposed Decision

The ALJ issued a proposed decision on June 30, 2017, recommending that Pruett's license be revoked. The ALJ's proposed decision expressly frames the case as a credibility contest between M.K. and C.K., on the one hand, and Pruett, on the other. The decision evaluates the credibility of each of the principal witnesses under Evidence Code section 780, offering specific observations regarding their demeanor, manner, and attitude. Although Pruett "cast himself as the unassuming victim of unfounded allegations," the ALJ found that "[h]is testimony and demeanor appeared calculated." By way of example, the ALJ observed that Pruett revealed only one "bad fact" about himself; namely, that he made a sexually inappropriate joke to M.K. But even that disclosure, the ALJ found, was "calculated rather than forthright," since, by casting the comment as a "joke," Pruett offered an explanation for how M.K. could have known that he refers to his penis as "junior," a nickname he had previously employed in written correspondence with the Board. Thus, the ALJ concluded that Pruett's disclosure failed to demonstrate honesty.

By contrast, the ALJ found that "M.K. and C.K. testified in a direct and straightforward manner." Although M.K. "became emotional while recounting the assault" and C.K. was "angr[y] with herself for not speaking up during the assault," both "demonstrated honesty by freely revealing bad facts about their own conduct." Specifically, the ALJ observed that both "expressed frustration and regret" over their perceived failure to protest or react when Pruett inappropriately touched them. The ALJ found that M.K. and C.K. described Pruett's conduct with "almost identical particulars," despite the fact they did not know one another and had never met. The ALJ further found that both women lacked financial resources to pay for their dental care, making them

11

more amenable to trade arrangements, and distinguishing them from other female patients who testified on Pruett's behalf. Neither woman, the ALJ found, was motivated to lie.[3]

The ALJ was not persuaded by Pruett's attempts to impeach M.K.'s credibility with unflattering character evidence. Although there was ample evidence that M.K. may have been "unreserved, negative, and bawdy," none of the evidence caused the ALJ to question M.K.'s credibility.

The ALJ was also unmoved by Pruett's attempts to impeach C.K.'s credibility with evidence that she returned to the office for a "cranial" on October 13, 2014. The ALJ found that Cindy, the primary witness for Pruett's return visit theory, evinced an attitude of blind loyalty to Pruett, was "unable to separate her conduct from his," and was demonstrably untruthful in asserting that no other patients had ever complained about sexually inappropriate behavior by Pruett. As such, the ALJ concluded that Cindy was not credible, and her testimony was entitled to little weight.

Although the ALJ acknowledged the existence of handwritten notes in C.K.'s chart bearing the October 13, 2014 date, she found the substance of the notes corresponded more closely with the dental examination that C.K. received on October 6, 2014, than the "cranial" she purportedly received the following week. The ALJ likewise found that the handwritten receipt for the ostensible October 13, 2014 appointment was entitled to "little weight because the receipt book, which could have established the dates receipts were issued before and after this one, was not offered." The ALJ also found significant the fact that no computer-generated appointment reminder could be found for the October 13, 2014 appointment. Accordingly, the ALJ concluded that the totality of

---

[3] The ALJ acknowledged that M.K. had requested $40,000 from Pruett to pay for additional dental work. However, M.K. dropped the request after the Board found that Pruett's work met the standard of care. Neither M.K. nor C.K. was seeking to recover anything from Pruett in any civil litigation, and neither had ongoing social interaction with him or his staff.

the evidence supported C.K.'s assertion that she received only one TMJ treatment from Pruett, after which, she returned once for a cleaning, and then never again.

"Ultimately," the ALJ found, "[M.K.]'s and [C.K.]'s testimony had significant markers of veracity, which [Pruett's] and [Cindy's] lacked." Accordingly, the ALJ found the Board had shown by clear and convincing evidence that Pruett "touched an intimate part of [M.K.] and [C.K.] for the purpose of sexual arousal, gratification, or abuse, which is unprofessional conduct." Based on that finding, the ALJ concluded that Pruett was subject to discipline for committing acts of sexual abuse and misconduct, that the acts were substantially related to the practice of dentistry, and that he could not continue performing the duties of a licensed dentist consistent with public health, safety, and welfare, even with restrictions on his license. (Bus. and Prof. Code, §§ 1670, 1680, subd. (e).) Consequently, the ALJ recommended that Pruett's license be revoked. The Board adopted the ALJ's proposed decision on July 25, 2017, with an effective date of August 24, 2017.

B.      *Substitution of Counsel and Preparation of Administrative Record*

Pruett was represented in the administrative proceedings by attorney Baumbach. Pruett retained new counsel some time thereafter, substituting a law firm known as Dental & Medical Counsel, P.C. on August 2, 2017. Dental & Medical Counsel immediately filed petitions to stay execution and for reconsideration, both of which were denied. Dental & Medical Counsel also began the process of requesting the administrative record.[4]

---

[4] Government Code section 11523 specifies that the complete administrative record "includes the pleadings, all notices and orders issued by the agency, any proposed decision by an administrative law judge, the final decision, a transcript of all proceedings, the exhibits admitted or rejected, the written evidence and any other papers in the case."

Dental & Medical Counsel requested copies of the transcripts of the administrative hearing by letter to the court reporter dated August 14, 2017. The firm formally requested a copy of the rest of the administrative record from the Board on August 15, 2017.[5] On August 16, 2017, Dental & Medical Counsel learned that the Board would not be releasing the exhibits contained within the administrative record, as they were sealed and the Board believed it was prevented from unsealing them by the terms of a protective order entered by the ALJ. Dental & Medical Counsel tried unsuccessfully to resolve the matter over the next day or so, and then proceeded to seek relief in the trial court with an approximation of the administrative record, cobbled together from records received from Baumbach.

C.     *Trial Court Proceedings*

Pruett, through Dental & Medical Counsel, filed a petition for writ of administrative mandamus and ex parte application for a stay of the Board's order on August 21, 2017. Pruett filed a notice of lodging a partial administrative record the same day. As relevant here, the petition alleges, in part, that "the Board has flatly **_refused_** to produce any trial exhibits to Dr. Pruett's current counsel to be used in these proceedings relying on a Protective Order by the ALJ which by its plain language does not apply to parties or their attorneys or this Court."

The parties appeared before the trial court on Pruett's ex parte application to stay the Board's order on August 22, 2017. At the hearing, the trial judge pressed Pruett's new counsel on why Pruett had waited so long to seek relief. Attorney Reymann, an attorney from Dental & Medical Counsel, explained that his firm had only recently been

---

[5] Dental & Medical Counsel had previously requested copies of the exhibits received into evidence by the ALJ from Deputy Attorney General Crawford, who had represented the Board in the administrative hearing. Crawford immediately responded, encouraging the firm to request the administrative record directly from the Board.

14

retained, and had struggled to reconstruct the administrative record. With respect to the exhibits received into evidence by the ALJ, Reymann explained that Dental & Medical Counsel had received copies of some exhibits from Baumbach, but Baumbach's files were incomplete, and the Board was refusing to release the complete set. With respect to the transcripts of the administrative proceedings, Reymann represented that they had been ordered, but would not be ready for several weeks. Following further discussion, the trial court granted the Board's request to continue the hearing to the next day to review the voluminous, albeit incomplete, record.

The parties returned to the trial court for the continued hearing on August 23, 2017. During the course of the continued hearing, Crawford stated that she had just learned of the Board's refusal to provide the complete administrative record and would be taking steps to ensure that all exhibits were released to counsel as soon as possible. As we shall see, Crawford soon made good on this commitment.

Following further argument, the trial court denied the application, finding that Pruett failed to satisfy either of the two prongs required for a stay under Code of Civil Procedure section 1094.5, subdivision (h).[6] (See § 1094.5, subd. (h)(1) [the trial court must be satisfied that (1) the stay will not cause the public interest to suffer, and (2) the respondent is unlikely to prevail on the merits].) With respect to the second prong, the trial court explained: "Even if I could convince myself that the public would not suffer, I don't think that you are even close to convincing me that the agency is unlikely to prevail in this matter. I've gone over everything you've given me. All of the documents, all of the arguments. Now, I don't have the transcript, and I don't have all of the exhibits, but as I look at the [ALJ's] ruling, and it's some fifty-two paragraphs of different findings that the administrative law judge made, I do believe that the administrative law judge did

---

[6] Undesignated statutory references are to the Code of Civil Procedure.

15

believe both of the complainants." Accordingly, the trial court found that Pruett had "not met either of the prongs, much less both of them."

As promised, Crawford caused copies of the administrative record (without transcripts) to be transmitted to Reymann by email and overnight mail on August 25, 2017. The record indicates that the court reporter emailed copies of the transcripts to Dental & Medical Counsel on August 28, 2017, and September 5, 2017.

The petition was set for hearing on September 24, 2018. Although various exhibits had been lodged with the trial court in connection with the stay application, the complete administrative record (with transcripts) had not been lodged by late August 2018. Accordingly, the Board, through Crawford, filed and served a notice of lodging of the administrative record on August 29, 2018. The notice contained the following representation by Crawford: "To the best of my knowledge, Petitioner has copies of all the records being filed herein." The notice further states that the records "are filed under seal due to the sensitive nature of the proceedings." The Board does not appear to have served a copy of the administrative record on Pruett, who was now represented by a new lawyer, attorney Hubbard.

The parties appeared for a trial readiness conference on September 21, 2018. In anticipation of the conference, Hubbard submitted a trial readiness conference statement indicating that he intended to call Pruett and other witnesses at the hearing. Hubbard said nothing to suggest that he was missing any part of the administrative record.

At the trial readiness conference, Hubbard sought leave to file a supplemental trial brief. He explained that his previously submitted trial brief failed to include all of his arguments, adding, "I didn't include the hearing transcripts because I believed the eyewitnesses would have been in order, but I can include hearing transcripts too, and citations to the record." Again, Hubbard said nothing to suggest that he was missing any part of the record. The trial court denied Hubbard's requests.

16

The parties appeared for the hearing on the petition on September 24, 2018.  On the eve of the hearing, Hubbard caused an "Objection to Notice of Lodging of Administrative Record and Hearing Transcripts" to be served on Crawford by email.  The objection, which was filed with the trial court the next day, states:  "Despite [the Board's] insinuation otherwise, [Pruett] was never served with the hearing transcripts, nor did [the Board's] counsel ever inquire as to whether or not [Pruett] had copies.  As such, he objects to the lodging of the hearing transcripts."

The hearing began with a presentation by Hubbard.  During the course of Hubbard's presentation, a question arose concerning a reference to the record.  Apropos of the record, Hubbard stated, "We were never served with a copy of the record."  The following colloquy then took place:

"[THE TRIAL COURT]:   Counsel, how does this happen?  What do you mean you were never served with a copy—

"[HUBBARD]:      I was never served.  If you read the original petition, you'll see that that was a main point of contention with his previous lawyer, that the Board was withholding critical hearing transcripts and trial exhibits.  [¶]  When they lodged it, they did not include a copy of the record.  They did not send me one.  And they only assumed I had a copy of it.

"[THE TRIAL COURT]:   Well, that's not before me today.

"[HUBBARD]:      No, it's not.  But when you asked—

"[THE TRIAL COURT]:   If you didn't get a copy of the record and there was some kind of objection, that should have been taken care of prior to today.  [¶]  Counsel, can you help me—

"[HUBBARD]:  There was an objection filed prior to today, Your Honor.

"[THE TRIAL COURT]:   I'm sorry.

"[HUBBARD]:      There was an objection filed prior to today, Your Honor.

"[THE TRIAL COURT]:  Was it heard by the Court?

17

"[HUBBARD]:       No, Your Honor.

"[THE TRIAL COURT]:    You've lost me."

Crawford then explained that Pruett's prior counsel (Dental & Medical Counsel) had run into problems requesting exhibits from the Board, but Crawford had intervened and ensured that all exhibits contained within the administrative record had been provided.  With respect to the transcripts, Crawford explained that she understood they had been requested by Pruett's prior counsel, and had confirmed with the court reporter that they had in fact been sent.  Crawford then explained that she had requested copies of the transcripts by letter to Hubbard, to which she received no response.  She went on to say that she had ordered her own copies of the transcripts from the court reporter and lodged the complete administrative record with the trial court, providing notice of the lodging to Hubbard.  "But," Crawford allowed, "I did not provide copies.  Because it was my understanding, as I stated in my letter to him, that he actually had all of the records.  And it was I that did not."  Hubbard denied receiving "records" from Pruett's prior counsel, and denied receiving the letter from Crawford.

Following further discussion, the trial court asked, "Why are we arguing about this?  We've got all of the records here.  I have done the preliminary review of them.  Is there anything I have not had for quite some time?"  Crawford responded in the negative. The trial court then stated, "So I've had it.  And I can't imagine that if it was anything you really needed, you would be waiting until the day of the trial to raise this with the Court.  We have everything here."  The trial court then instructed Hubbard to continue with his argument.  Hubbard responded, "Fair enough."  He then proceeded to argue that the ALJ erred in evaluating the credibility of M.K. and C.K., referring both to their testimony in the administrative proceedings and the testimony of other witnesses. Hubbard also made repeated references to various exhibits contained within the administrative record.

The trial court denied the petition by order dated November 2, 2018. The order states in pertinent part: "The court has reviewed the administrative record and heard argument from counsel. Applying the standard of review under the independent judgment test, set forth in . . . section 1094.5, subdivision (b), the court finds that the [Board] has proceeded with proper jurisdiction, there was a fair trial and there was not any prejudicial abuse of discretion. The findings were supported by the weight of the evidence and there was no abuse of discretion." The trial court entered a judgment denying the petition on December 17, 2018.

## II. DISCUSSION

Pruett raises two primary contentions on appeal. First, he argues he was denied constitutional due process by the Board's handling of the administrative record, and the trial court's decision to proceed with the hearing on the petition, despite Hubbard's claim to have been deprived of the record. Second, he argues the trial court erred in finding that the ALJ's findings were supported by the weight of the evidence. We consider Pruett's contentions in turn.

### A.    *Administrative Record*

Pruett raises several related issues regarding the administrative record. First, he challenges the Board's failure to release exhibits in August 2017. Second, he challenges the Board's failure to serve him with a copy of the lodged administrative record in August 2018. Finally, he challenges the trial court's decision to proceed with the hearing on the petition, despite his counsel's claim to have never received a copy of the administrative record. We need not unpack these contentions as we conclude Pruett has forfeited any challenge to the lodging of the administrative record by failing to timely object in the trial court.

California law is clear that "it is the responsibility of the petitioner to make available to the trial court an adequate record of the administrative proceeding; otherwise the presumption of regularity will prevail, since the burden falls on the petitioner

19

attacking the administrative proceeding to demonstrate to the trial court where the administrative proceedings were unfair, were in excess of jurisdiction, or showed ' "prejudicial abuse of discretion." ' " (*Foster v. Civil Services Com.* (1983) 142 Cal.App.3d 444, 453.) Here, Pruett lodged a partial administrative record at the time of the ex parte hearing in August 2017, before the transcripts of the administrative proceeding had been completed. But Pruett failed to lodge the complete administrative record with the trial court after the transcripts became available. Accordingly, the Board filed and served a notice of lodging of the administrative record on August 29, 2018, more than three weeks before the hearing on the petition.

Had Hubbard believed he was missing anything from the lodged administrative record, he could have met and conferred with Crawford, raised the matter at the trial readiness conference, or brought the issue to the trial court's attention by noticed motion or timely objection.[7] But Hubbard did none of these things. Instead, he waited until the day before the hearing on the petition (a Sunday) to serve an objection to the notice of lodging of the administrative record. That objection focuses solely on the Board's failure to either serve copies of the hearing transcripts on Pruett or confirm that he already had them.[8] The objection does not say that Pruett had been unable to secure copies of the

---

[7] We note in passing that Hubbard served form interrogatories, requests for admission, and a request for production of documents on the Board, and then followed up with a motion to compel responses to such discovery, all in the four months preceding the hearing on the petition. These discovery activities demonstrate Hubbard was willing to seek information when he wanted it.

[8] Neither of the parties has directed our attention to any statute, rule of court, or local rule specifying service requirements for the lodged administrative record, and our own research has uncovered none. In the absence of any such authority, we have consulted a leading treatise on administrative writ practice, which states: "The party that prepares the record is generally the party that lodges it with the court. That party should provide copies to the opposing parties, and the record should not be lodged with the court before that is done; like any other pleading or document, the record should not be lodged with

transcripts from the court reporter or his prior counsel. Nor does the objection say anything to suggest that Pruett lacked copies of the exhibits received in evidence by the ALJ.

Hubbard filed the objection with the trial court the next day, but said nothing to indicate there was any problem with the administrative record until partway through his argument, when the court happened to ask an unrelated question about the record. Even then, Hubbard made no effort to press for a ruling on the untimely objection or continue the hearing. To the contrary, Hubbard agreed that the objection was not before the trial court and readily acquiesced when the court directed him to continue with his argument.[9] On the record before us, we conclude that Pruett forfeited any objection to the lodging of the administrative record by failing to timely and meaningfully object in the trial court. (*Avalos v. Perez* (2011) 196 Cal.App.4th 773, 776 ["As a general rule, a claim of error will be deemed to have been forfeited when a party fails to bring the error to the trial court's attention by timely motion or objection"].) But even assuming the issue was preserved, we would conclude that Pruett suffered no prejudice from any failure of service.

The record discloses that Pruett's prior counsel (Dental & Medical Counsel) requested the administrative record in August 2017. The Board initially refused to

---

the court until it has been served on all parties." (1 Cal. Administrative Mandamus (Cont.Ed.Bar 3d ed. 2016) The Administrative Record, § 4.13, p. 4-21.) We assume without deciding that the Board should have served a copy of the lodged administrative record on Pruett. (*Ibid.*; but see *Foster v. Civil Services Com., supra,* 142 Cal.App.3d at p. 453 [petitioner has the burden, in the first instance, to request and pay for preparation of the administrative record].)

[9] We note with disapproval that Hubbard appears to have dissembled when he twice told the trial court that an objection to the administrative record had been "filed prior to today."

21

release the exhibits, apparently believing them to be subject to the ALJ's protective order. But Crawford promptly rectified the situation, providing copies of the administrative record (without transcripts) by email and overnight mail within days of the ex parte hearing. We are satisfied that Crawford's corrective action cured any harm caused by the Board's initial refusal to release the exhibits. Although Dental & Medical Counsel may not have had the exhibits at the time of the ex parte hearing, the order denying the ex parte application is not before us, and we have no reason to doubt the veracity of Crawford's representation that she transmitted the administrative record (without transcripts) in August 2017, giving Pruett's prior counsel ample time to prepare for the hearing on the petition. That Pruett's subsequent counsel, Hubbard, claims not to have received unspecified "records" from Dental & Medical Counsel does not establish any ongoing impropriety by the Board or error by the trial court.

Pruett argues "the Board forced him to attack a record he ha[d]n't seen, with exhibits he didn't have, using transcripts he'd never read." But the record tells a different story. As noted, the record before us indicates that Crawford transmitted copies of the administrative record (without transcripts) to Dental & Medical Counsel in August 2017, more than a year before the hearing on the petition. As for the transcripts, Dental & Medical Counsel represented on the record that they had been ordered in August 2017, and Hubbard himself told the trial court he wanted to submit a supplemental trial brief that would "include hearing transcripts" and "citations to the record" at the trial readiness conference just two days before. Although Pruett may not have received a service copy of the lodged administrative record, the appellate record leaves little doubt that Hubbard had copies of the underlying components of the administrative record, including the hearing transcripts and exhibits, to which he repeatedly referred during the hearing on the petition. And even now, nothing suggests that there was anything in the lodged administrative record that was not available to Pruett at the time of the hearing, albeit perhaps in some other format. Certainly, Pruett has not identified any hearing transcript

22

or exhibit that he was prevented from reviewing or relying upon. On the record before us, we would conclude that Pruett has failed to show prejudice from any failure of service. Therefore, even assuming Pruett's due process claim was not forfeited, we would reject it.

B.      *Sufficiency of the Evidence*

Pruett next challenges the sufficiency of the evidence supporting the trial court's determination that the weight of the evidence supports the Board's findings that he committed acts of sexual abuse and misconduct against M.K. and C.K. He argues the trial court failed to credit evidence pointing to his innocence, including evidence the Butte County District Attorney's Office declined to bring criminal charges against him, and evidence that M.K. and C.K. are "flawed witnesses." These arguments fall far short of establishing error.

The standard of proof in an administrative hearing to revoke a professional license is clear and convincing evidence. (*Sandarg v. Dental Bd. of California* (2010) 184 Cal.App.4th 1434, 1441.) "Evidence of a charge is clear and convincing so long as there is a 'high probability' that the charge is true. [Citations.] The evidence need not establish the fact beyond a reasonable doubt." (*Broadman v. Commission on Judicial Performance* (1998) 18 Cal.4th 1079, 1090.)

When an administrative decision affects a fundamental vested right, such as the revocation of a professional license, the trial court must exercise its independent judgment in reviewing that decision to determine if it is supported by the weight of the evidence. (§ 1094.5, subd. (c); *Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 574.) "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision"—here, Pruett—"bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817.) Thus, the trial court reweighs the

23

evidence, including the credibility of witnesses, and after "giving due respect to the agency's findings," may "substitute its own findings" for that of the agency. (*Id.* at p. 818; see also *Rand v. Board of Psychology, supra,* 206 Cal.App.4th at p. 574 [the trial court conducts a " 'limited trial de novo ' " in which it "resolves evidentiary conflicts, assesses the witnesses' credibility, and arrives at its own independent findings of fact"].)

We, in turn, review the trial court's findings, rather than the agency's findings, for substantial evidence. (*Duarte v. State Teachers' Retirement System* (2014) 232 Cal.App.4th 370, 383-384 (*Duarte*); *Rand v. Board of Psychology, supra,* 206 Cal.App.4th at p. 591 ["we review the trial court's factual findings, not those of the administrative agency"].) Thus, "our review of the record is limited to a determination whether substantial evidence supports the trial court's conclusions and, in making that determination, we must resolve all conflicts and indulge all reasonable inferences in favor of the party who prevailed in the trial court." (*Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 659-660.) "Further, we cannot reweigh the evidence. Thus, we do not determine whether substantial evidence would have supported a contrary judgment, but only whether substantial evidence supports the judgment actually made by the trial court." (*Duarte, supra,* at p. 384.) "Evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible and of solid value." (*Kearl v. Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1052.) This standard can be satisfied by the testimony of a single credible witness. (*Ibid.*) If substantial evidence exists in the record to support the trial court's judgment, we must affirm. (See *Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 512.)

We have little difficulty concluding that the trial court's findings were supported by substantial evidence. The trial court could reasonably rely on the testimony of M.K. and C.K., which established that Pruett committed acts of sexual abuse or misconduct on patients on two separate occasions. (*Kearl v. Board of Medical Quality Assurance, supra,* 189 Cal.App.3d at p. 1052.) The trial court could also reasonably rely on the

ALJ's credibility determinations, which were discussed in detail in the proposed decision and entitled to "great weight" to the extent they were supported by the ALJ's observations of the witnesses' demeanor, manner, and attitude (Gov. Code, § 11425.50, subd. (b)), as many clearly were. Although there was evidence from which the trial court could have reached contrary findings or differing credibility determinations, that evidence does not negate the existence of the substantial evidence supporting the findings and determinations that were made, and we are not at liberty to reweigh that evidence or reassess the credibility of the witnesses. (*Duarte, supra,* 232 Cal.App.4th at p. 384.) We therefore reject Pruett's challenge to the sufficiency of the evidence.

Pruett's arguments concerning the Butte County District Attorney's Office do not change our analysis or conclusion. Pruett theorizes that criminal charges were never brought against him because the District Attorney evaluated the police reports and concluded there was no probable cause to believe a crime had been committed. Nothing in the record supports Pruett's theory, and we cannot infer anything from the mere fact that charges were never brought. (See *People v. Childs* (2013) 220 Cal.App.4th 1079, 1103-1104 ["A prosecutor's decision about filing criminal charges arises from complex law enforcement considerations that are not generally subject to judicial supervision"]; *People v. Nelson* (2008) 43 Cal.4th 1242, 1256 [" 'Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt,' " and courts may "not second-guess the prosecution's decision" in that regard].) Moreover, and more to the point, the District Attorney's charging decisions, whatever they may have been, do not change our substantial evidence review. As we have established, there was substantial evidence from which the trial court could have concluded that Pruett committed acts of sexual abuse or misconduct against M.K. and C.K.

Finally, Pruett argues that M.K. and C.K. were "flawed witnesses," while he is "a well-known dentist who has unwaveringly professed his innocence for years." Pruett's

argument amounts to yet another invitation to reweigh the evidence and reassess witness credibility, which we again decline.

### III.  DISPOSITION

The judgment is affirmed.  The Board is awarded its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

RENNER, J.


We concur:

/S/

HULL, Acting P. J.


/S/

DUARTE, J.

26